| |
|---|
| **SIGNET TECHNOLOGIES, INC., DOING BUSINESS AS CONVERGINT FEDERAL SOLUTIONS,** *Plaintiff*, v. **THE UNITED STATES,** *Defendant,* and **SECURITYHUNTER, INC.,** *Intervenor-Defendant.* |

*Ira Hoffman*, Butzel Long, Washington, D.C., for Plaintiff.

*Mikki Cottet,* Senior Trial Counsel, *Franklin E. White, Jr.,* Assistant Director, *Martin F. Hockey, Jr.,* Acting Director, *Brian M. Boynton,* Acting Assistant Attorney General, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for Defendant.

*James Y. Boland* and *Krista Nunez*, Venable, LLP, Vienna, VA, for Intervenor-Defendant.

### MEMORANDA OPINION AND ORDER

**TAPP, Judge.**

This bid protest considers whether the Social Security Administration ("SSA") erred when it established a vehicle for the purchase, maintenance, and installation of security system

---

[1] This Order was originally filed under seal on June 16, 2021, (ECF No. 44). The Court provided parties the opportunity to review this Opinion for any proprietary, confidential, or other protected information and submit proposed redactions. The proposed redactions were filed June 30, 2021, (ECF No. 48) and are accepted by the Court. Thus, the sealed and public versions of this Opinion differ only to the extent of those redactions, the publication date, and this footnote.

equipment in its offices across the United States. On March 10, 2021, Plaintiff, SigNet Technologies, Inc., doing business as Convergint Federal Solutions, ("SigNet")[2], filed its Complaint against Defendant, United States, acting by and through the SSA. (*See* Complaint ("Compl."), ECF No. 1). SigNet asserts that the SSA impermissibly established an agreement for the purchase and installation of security equipment at SSA offices. (*Id.*). In turn, SigNet requests declaratory injunctive relief providing that the SSA's award lacks a rational basis and is otherwise unreasonable, arbitrary and capricious, and contrary to applicable law and regulation. (*Id.*). The awardee, Securityhunter, Inc. ("Securityhunter"), successfully intervened in this suit on March 11, 2021. (ECF No. 10).

Before the Court are the parties' Cross-Motions for Judgment on the Administrative Record and Securityhunter's Motion to Dismiss. For reasons articulated below, the Court **DENIES** SigNet's Motion for Judgment on the Administrative Record, (Pl.'s MJAR, ECF No. 25), **GRANTS** the United States' Motion for Judgment on the Administrative Record, (Def.'s MJAR, ECF No. 28), **GRANTS** Securityhunter's Motion for Judgment on the Administrative Record, (Int.-Def.'s MJAR, ECF No. 29), and **DENIES** Securityhunter's Motion to Dismiss and Motion to Strike, (*id.*).

## I. Background[3]

### A. *The Solicitation*

This post-award bid protest involves a challenge to the SSA's decision to establish a Blanket Purchase Agreement ("BPA") with Securityhunter for the purchase and installation of security equipment. On June 10, 2020, the United States issued a Request for Quotations[4] ("RFQ") seeking to establish a Physical Security Systems Standardization and Support Services ("PS5") BPA for "equipment, acquisition, installation and maintenance services to support project management, site system design, installation, maintenance, inventory management, miscellaneous work and repair of security equipment at [SSA] offices" at approximately 1,500

---

[2] Throughout the United States' and Intervenor-Defendant's briefing, Plaintiff is referred to as "Convergint." The initial filing from Plaintiff refers to itself as "SigNet." For uniformity, this Opinion refers to Plaintiff as "SigNet."

[3] The Administrative Record, (ECF No. 24), is consecutively paginated, thus the Court will cite to the record using "(AR __)." On May 24, 2021, the United States moved to amend the record after it discovered errors preventing the parties from accessing a portion of the AR. (ECF No. 37). The Court granted the United States' motion and accepted corrected attachment, which replaced pages 453–678 of the Administrative Record. (ECF Nos. 37-1; 40). Any citations to that portion of the record reflect citation to the corrected document.

[4] Solicitation No. 28321320Q00000234.

locations nationwide. (Administrative Record ("AR") 557).[5] In an effort to enhance its physical security, the SSA sought to establish this BPA to provide "standardized video services including video surveillance systems (VSS), intrusion detection systems (IDS), duress alarms, and physical access control systems (PACS), and other physical security equipment installation, maintenance, and support services" to all SSA offices. (AR 523).

The RFQ articulated multiple requirements, only some of which are relevant here. The Statement of Work ("SOW") explained that the BPA "intended to serve as a vehicle for the purchase of all security system equipment and materials required for maintenance and installations." (AR Tab 23 at 1715 ("the SOW")). The SOW outlined various requisite services, including design, installation, maintenance, and physical security assessments, and noted Lenel[6] products as just one of many other branded systems currently in place at the SSA. (*See* AR Tab 23 at 1715–17).

The RFQ instructed offerors to submit their quotes in two separate volumes—Volume I (Non-Price) and Volume II (Price). (AR 1701). In Volume I, offerors provided proposed solutions, information, and specified materials consistent with the Corporate Experience, Past Performance, and Technical Approach factors outlined in the RFQ. (*See* AR 1702–07). As part of their Volume II quotes, offerors submitted "[c]omplete pricing tables found in Section D/Attachment 3" of the RFQ, which included the mandatory "Pricing Schedule" template that detailed the required labor, equipment, and maintenance line items. (AR 1708).

Importantly, the RFQ authorized the use of Contractor Teaming Arrangements ("CTAs"), described and explained as follows:

> A Schedule Contractor Teaming Arrangement (CTA) is an arrangement between two or more Schedule Contractors to work together to meet agency requirements. The CTA allows the Contractor to meet the government agency needs by providing a total solution that combines the supplies and/or services from the team members' separate Schedule contracts. . . .
>
> A CTA document is required for any proposed CTA under this BPA. A CTA document is a written agreement between the team members detailing the responsibilities of each team member during the BPA performance period. If a CTA is proposed, the Contractor shall specifically identify the CTA as such

---

[5] The SSA amended the RFQ six times, (AR 288–706, 2181–82), and responded to offeror's questions in amendments 3 and 5, (AR 382–391, 511–522, 2182). Unless otherwise indicated, references to the solicitation are to amendment 5, (AR 453–678), which incorporates all prior amendments to the RFQ. (*See also* AR 2758–83).

[6] Lenel is the producer of some portion of the equipment and software required for performance of the BPA; in order to sell, implement, and service Lenel security systems, a contractor must be certified by Lenel as a Value Added Reseller ("VAR"). (Compl. at 12–16).

3

in its quotation. The Contractor's CTA document must be complete and fully executed between the parties. If a CTA is proposed, the Contractor shall identify a Team Lead to be the main point of contact between the Government and the CTA Team Members. The CTA Team Lead will be responsible for all communication, ordering procedures, delivery requirements, invoicing and payment, warranties and all other activities within the CTA "model" document (*See* [AR 2980-82]). The Contractor's CTA document must be submitted to the government as part of its quotation in response to this RFQ. Failure to provide a complete and fully executed CTA document in accordance with this solicitation will result in no further consideration of the Contractor's quotation . . ..

(AR 2801–02). The RFQ pointed offerors to GSA's website for further information regarding this explanation. (*See* AR Tab 23 at 1700).

The RFQ then set forth the terms of the "quote format," stating: "Quotes must set forth full, accurate, and complete information as required by this RFQ. The government will rely on such information in the award of the BPA." (AR 2803 (emphasis added)).

The RFQ set forth the "evaluation factors" as follows:

> The Government intends to establish a single-award BPA to the responsible contractor whose quote, conforming to the RFQ, represents the *best value* to the Government, considering both price and non-price factors. This may be determined by using a trade-off process that allows us to consider award to other than the lowest price Contractor or other than the highest technically rated Contractor. For this solicitation, all non-price evaluation factors, when combined, are significantly more important than price. The non-price factors ([1] Corporate Experience, [2] Past Performance, and [3] Technical Approach) have equal weight/importance. SSAS intends to make an award based on initial quotations.

(AR 2812 (italics in original; numbers in brackets added)).

The SSA was to evaluate the first non-price factor by assessing the relevance of an offeror's Corporate Experience, considering the extent to which the offeror's maximum of three "identified projects/contracts adequately demonstrate its experience in providing supplies/services similar in size, scope, and complexity" to the requirements under the RFQ. (*Id*.). The RFQ instructed offerors to include descriptions of at least one, but no more than three, contracts/projects that "clearly and conclusively demonstrate the Contractor's relevant experience (similar in size, scope, and complexity)" to the RFQ's requirements. (AR 2804). The information that offerors were to provide for each contract/project for the evaluation of Corporate Experience included the following:

> A complete and full description of the services provided (in your role as either the Prime Contractor, CTA member, or subcontractor) for each contract/project. Specifically, describe the extent to which the work

4

performed under the cited/referenced contract/project is similar in size, scope, and complexity to the requirements set forth in the Statement of Work (SOW) and elsewhere in this solicitation….

(AR 2805).

The RFQ notified offerors that submitted quotations be made as a CTA and include a "complete" "CTA document," addressing "each element in the CTA 'model'…." (AR 2810). Providing guidance for evaluating CTAs for Corporate Experience, the RFQ stated:

> **Contractor Team Arrangements (CTA)**: SSA will evaluate Corporate Experience and Past Performance of each party to the CTA only to the extent that it relates to the work that each party will be responsible for under the BPA. Previous experience and past performance of the CTA, operating as a CTA (comprised of the same CTA members), is considered more relevant than experience and past performance of the individual parties to the CTA, as it represents experience and past performance of the team rather than that of the individual players.

(AR 2813 (bold emphasis in original)).

For Past Performance, the RFQ explained that the evaluation would be a "subjective assessment based on performance history on the contracts/projects cited in the 'Corporate Experience' section of the Contractor's quotation." (AR 2806). The SSA was to evaluate the past performance of the contractor's identified projects/contracts based on information in the quotation, responses to the Past Performance Questionnaires received from references, and additional pertinent information relative to the offeror's Contractor Performance Assessment Reporting System. (AR 2813–14). This evaluation would be based on the quality of service, timeliness of performance, and management of personnel/business relations. (AR 2814).

As to Technical Approach—the final non-Price factor—the RFQ stated in part as follows:

> The Technical Approach section must thoroughly describe in narrative form the solution proposed by the Contractor, and must be sufficiently specific, detailed and complete to clearly and fully demonstrate the techniques and procedures the Contractor will employ to meet all of the requirements of the SOW….

(AR 2808). As part of its Technical Approach, the RFQ required each offeror to submit a "staffing plan" proposing a "project team for the BPA, as well as the ability to deliver personnel with the appropriate knowledge, experience and skills throughout the entire period of performance, including options." (*Id.*). The SSA should consider "specifics" of the technical approach, and quotations must "clearly demonstrate an understanding of the government's requirements and provide a high likelihood for success to be eligible for award." (AR 2814).

Turning to pricing, the RFQ indicated that the Agency "will perform a price analysis . . . to evaluate the contractor's submission for completeness, accuracy, and reasonableness." (AR 2815). The SSA was to evaluate quotations for award purposes by adding the total price for the

5

base period to the total price for all options to arrive at a total evaluated fixed-price for the full performance of the BPA. (*Id*.). The SSA could "reject any quote that contains 'unbalanced pricing.'" (*Id*.).

### B. *Quotations, Evaluations, and Award*

The SSA received quotes from ███████████, SigNet, and Securityhunter, determining those quotes to be timely and compliant with the solicitation requirements. (AR 2065–67, 2182). Among those quotes, Securityhunter submitted a CTA to address SSA's current use of Lenel PACS. (AR 524). Because it is not a Lenel authorized retailer, Securityhunter does not offer Lenel-certified technicians on its Federal Supply Schedule ("FSS") contract. (Int.-Def.'s MJAR at 7; *see also* AR 2591). To meet the RFQ's limited requirement to procure Lenel equipment and to provide several Lenel-certified technicians concerning the BPA, Securityhunter has established a CTA with Executive Technologies Corporation ("ETC"), a Lenel VAR. (*See* AR Tab 21 at 780, 822–28).

The technical evaluation team ("TET") and price evaluation team ("PET") received and evaluated quotes. (Def.'s MJAR at 11). The TET's evaluation included a review of the non-price factors (corporate experience, past performance, and technical approach) of each bid to identify any strengths, weaknesses, significant weaknesses, and deficiencies. (AR 2068). After review, the TET assigned a rating as: exceptional, very good, satisfactory, marginal, or poor. (AR 2070–74). To determine which quote offered the best value, the Contracting Officer ("CO") completed a trade-off analysis, where "all non-price evaluation factors, when combined, are significantly more important than price," and non-price factors "have equal weight/importance." (*Id*. at 1710). Per the RFQ, the CO assigned offerors the following ratings:

| Quoter's Name | Corporate Experience | Past Performance | Technical Approach | Total Price |
|---|---|---|---|---|
| ███████[7] | ███ | ███ | ███ | ███ |
| Securityhunter[8] | ███ | ███ | ███ | ███ |
| SigNet[9] | ███ | ███ | ███ | ███ |

(*See* AR Tab 34 at 2220). The CO went on to rank offerors as follows:

---

[7] (AR 2074–79).

[8] (AR 2083–88).

[9] (AR 2079–83).

6

| Overall Technical Ranking | Quoter | Overall Price Ranking | Quoter |
|---|---|---|---|
| 1 | Securityhunter | 1 | Securityhunter |
| 2 | ■ | 2 | ■ |
| 3 | ■ | 3 | ■ |

(*See id.*).

After conducting the best value assessment, the CO summarized a comparison of SigNet and Securityhunter's quotes:



(AR 2228) (emphasis added).

After consideration of the CO's analysis, the SSA awarded the BPA to Securityhunter on September 29, 2020. (AR 2229–420). The following day, the SSA notified SigNet that it had not received the award. (AR 2581–82). Subsequently, on October 1, 2020, following FAR 8.405-3(b)(3), the Agency provided SigNet the following explanation for its award decision:

> Again, the best value decision to award to Securityhunter, Inc. was based on their technical merit ■■■■■■■■ ] and [ ■■■■■■■ ] price after

performing a trade-off, consistent with how SSA identified that the quotations would be evaluated in Solicitation Section E-6 Evaluation Criteria.

(AR 2595).

### C. *SigNet's GAO Protest and Protective Order*

On October 13, 2020, SigNet filed a protest[10] with the United States Government Accountability Office ("GAO") challenging the SSA's award of the BPA to Securityhunter. (*See* AR Tab 47 at 2610–20). The GAO entered an automatic stay under the Competition in Contracting Act (CICA) and Securityhunter was instructed to suspend contract performance on October 14, 2020. (Def.'s MJAR, Ex. 1 ("Brennan Decl.")). On November 25, 2020, rather than filing comments or supplemental protest grounds, SigNet filed a notice withdrawing its protest. (*See* AR Tab 60 at 3231). The GAO closed the protest file that same day. (*See* AR Tab 61 at 3232). More than three months after voluntarily withdrawing its protest with the GAO, on March 10, 2021, SigNet filed its Complaint pursuant to 28 U.S.C. § 1491(b). (*See* Compl.).

## II. Analysis

### A. *Motion to Strike Complaint and Dismiss*

The Court will first address Securityhunter's Motion to Strike SigNet's Complaint and motion for outright dismissal. Securityhunter asserts two grounds for dismissing SigNet's Complaint—failure to state a claim for which relief can be granted and for lack of subject matter jurisdiction. (*See generally* Int.-Def.'s MJAR).

The burden of establishing subject matter jurisdiction rests with the plaintiff, who must do so by a preponderance of the evidence. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988). When faced with a motion to dismiss for lack of subject matter jurisdiction according to the RCFC 12(b)(1), the Court must assume that all undisputed facts alleged in the complaint are true and draw all reasonable inferences in the plaintiff's favor. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *overruled on other grounds by Davis v. Scherer*, 468 U.S. 183 (1984); *see also Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995). In determining whether a plaintiff has met this burden, courts may look "beyond the pleadings and 'inquire into jurisdictional facts' in order to determine whether jurisdiction exists." *Lechliter v. United States*, 70 Fed. Cl. 536, 543 (2006) (quoting *Rocovich v. United States*, 933 F.2d 991, 993 (Fed. Cir. 1991)).

A protective order was issued during SigNet's sojourn at the GAO. (ECF No. 18, Ex. A ("GAO Protective Order")). Securityhunter alleges that SigNet used protected materials obtained during GAO proceedings in its Complaint before this Court—specifically Securityhunter's sealed bid proposal. (ECF No. 18; *see also* Int.-Def.'s MJAR at 10). Due to that alleged violation, Securityhunter urges the Court to strike relevant portions of SigNet's Complaint

---

[10] GAO Docket No. B-419328.1.

pursuant to RCFC 12(f) and dismiss the Complaint for failure to state a claim. (Int.-Def.'s MJAR at 11–16). The Court declines to do so.

Paragraphs 7 and 8 of the GAO-issued Protective Order state:

> 7. Within 60 days after the conclusion of the protest (including any requests for reconsideration or entitlement, or claims for costs), each party admitted to this protective order must destroy all protected material received pursuant to this protest, including all electronically transmitted material and copies of such material, with the exception of a single copy of a protected decision or letter issued by our Office, and certify in writing to each other party that such destruction has occurred or must return the protected information to the parties from which the information was received…. Any individual retaining material received under this protective order (except for the single copy of a protected decision or letter issued by our Office) beyond the 60-day period without the authorization of GAO or the prior written agreement of the party that produced the material is in violation of this order. . . The terms of this protective order (except those terms regarding the return or destruction of protected material) shall apply indefinitely to the single copy of the protected decision or letter issued by our Office that is retained by a party admitted under this order.
>
> 8. Material to which parties gain access under this protective order is to be used only for the subject protest proceedings, absent express prior authorization from the GAO. Protected material obtained under this protective order may be used, however, in a bid protest filed with the United States Court of Federal Claims, without GAO's prior authorization, provided that the information is filed under seal with the Court, that the Court is informed of GAO's protective order, and that the Court is requested to issue its own protective order to cover the protected material. In addition, GAO must be notified no later than one business day after suit is filed with the Court, regardless of whether protected information is used in the Court filing. After the Court issues its own protective order, use of material protected under the GAO protective order will be governed by the protective order issued by the Court.

(GAO Protective Order ¶¶ 7–8).

A significant portion of SigNet's Complaint is indeed related to Securityhunter's quotation and proposal. (*See* Compl. at 20–29). SigNet does not controvert that it retained information garnered from the GAO protest; instead, SigNet contends that it was exempt from the GAO's 60-day retention cap because the protected documents were retained concerning this bid protest. (ECF No. 20; *see also* Pl.'s Resp. 14–15).

On April 6, 2021, Securityhunter filed a notice with the GAO describing the alleged violations of that protective order and requested a determination as to those violations. (Int.-Def.'s MJAR at 10–11). In that request, "Securityhunter explained to the GAO that the

Complaint filed in this case relied extensively on portions of Securityhunter's proposal that counsel for SigNet was required to destroy no later than January 25, 2021, per Paragraph 7 of the GAO's protective order." (*Id.* at 11). On May 6, 2021, the GAO apparently informed the parties that it was "still reviewing the filings submitted by the parties" and that it would inform the parties of its decision at a later date. (*Id.*). As far as the Court is aware, the GAO has not issued a determination as to SigNet's apparent violations.

The crux of Securityhunter's argument for striking the Complaint, and ultimately dismissal, is that SigNet's use of information which it improperly retained from the earlier GAO proceeding effectively rendered the protected material "fruit of the poisonous tree."[11] RCFC 12(f) empowers the Court to "strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter" and states that the Court "may act . . . on its own." Securityhunter alleges that, should SigNet's Complaint be stricken under this rule, the Complaint would fail to state a claim for which relief could be granted pursuant to RCFC 12(b)(6).

The Court is apprehensive regarding its role, if any, in interpreting protective orders issued by a different forum, particularly when that forum has the issue squarely before it and has yet to rule. To do so could present significant and consequential procedural issues, running counter to notions of judicial efficiency and restraint. Hypothetically, if the Court were to find that a violation exists, thereby ruling in Securityhunter's favor, but the GAO later found to the contrary, what remedy could reconcile those inconsistent rulings? Short of reopening this protest and starting anew, there are no other channels for relief. Without a ruling from the GAO, this Court is unable to definitively rule that the information SigNet used in its Complaint was improper and therefore should be stricken pursuant to RCFC 12(f). Since there has been no ruling, and because this protest is denied on other grounds set forth below, the Court will not act absent the GAO's application of its own protective order. As such, Securityhunter's Motion to Strike is denied and SigNet's Complaint will not be dismissed on these grounds.

Securityhunter next insists the Court dismiss SigNet's Complaint pursuant to RCFC 12(b)(1) based on what it perceives as SigNet's failure to comply with material requirements of the RFQ. (Int.-Def.'s MJAR at 16–23). Securityhunter claims that, because SigNet apparently failed to comply with the material requirements of the RFQ, it thus lacks standing to pursue relief in this Court. (*Id.*).

Standing is a threshold issue that implicates the Court's subject-matter jurisdiction. *Lujan*, 504 U.S. at 560–61. And so, if a plaintiff cannot establish standing, the Court is without jurisdiction to render a decision on the merits of a claim. *Myers Investigative & Sec. Servs. v. United States*, 275 F.3d 1366, 1369–70 (Fed. Cir. 2002). The Court assumes well-pled allegations of error to be true for purposes of the standing inquiry. *Square One Armoring Serv.,*

---

[11] In context of criminal law, the exclusionary rule encompasses both the "primary evidence obtained as a direct result of an illegal search or seizure" and, relevant here, "evidence later discovered and found to be derivative of an illegality," the so-called "'fruit of the poisonous tree.'" *Utah v. Strieff*, 136 S. Ct. 2056, 2061, (2016) (citing *Segura v. United States*, 104 S.Ct. 3380, (1984)). The Court draws parallels to this suit in that the protected materials used in SigNet's Complaint are allegedly derivative of the improper retention of materials.

*Inc. v. United States*, 123 Fed. Cl. 309, 323 (2015) (citing *Digitalis Educ. Sols., Inc. v. United States*, 97 Fed. Cl. 89, 94 (2011), *aff'd*, 664 F.3d 1380 (Fed. Cir. 2012)). Under the Tucker Act, the Court has jurisdiction over "an action by an interested party objecting . . . to an alleged violation of a statute or regulation with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). In evaluating who qualifies as an interested party with standing to bring a bid protest claim, the Court looks to the definition of "interested party" provided in CICA. *Myers*, 275 F.3d at 1370 (quoting *Am. Fed'n of Gov't Employees v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001)); *see* 31 U.S.C. § 3551(2). And so, to have standing, a plaintiff must show that: "'it [(1)] is . . . an actual or prospective bidder and [(2)] . . . has a direct economic interest' in the procurement or proposed procurement." *Diaz v. United States*, 853 F.3d 1355, 1358 (Fed. Cir. 2017) (alterations in original) (quoting *Digitalis Educ. Sols., Inc. v. United States*, 664 F.3d 1380, 1384 (Fed. Cir. 2012)); *see also* 31 U.S.C. § 3551(2).

While Securityhunter's arguments to this point are well-reasoned, the Court cannot ignore the United States' determination (and concession) that SigNet's quotation was compliant with solicitation requirements. (Def.'s MJAR at 11 ("[t]he SSA received and evaluated three quotes, including quotes from Convergint and Securityhunter, which were all determined to be timely and compliant with the solicitation requirements) (citing AR 2065–66, 2067, 2182)). The Court cannot reasonably defer to the agency's discretion in its ultimate decision while ignoring its ground-level determination that an offeror complied with the RFQ requirements. Because the United States effectively concedes that SigNet's quotation largely complied with the RFQ, the Court will not dismiss SigNet's Complaint for failure to establish standing.

Based on these findings, the Court denies Securityhunter's Motion to Strike and Dismiss. SigNet's claims will be addressed on the merits.

### B. Motions for Judgment on the Administrative Record

In bid protest cases, this Court reviews agency actions under the Administrative Procedure Act's "arbitrary and capricious" standard. *See* 28 U.S.C. § 1491(b)(4); 5 U.S.C. § 706(2)(A), (D). Under this standard, an "award may be set aside if either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001).

When a challenge is brought on the first ground like the instant case, the test is whether "the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a 'heavy burden' of showing that the award decision 'had no rational basis.'" *Id*. at 1332–33 (internal citations omitted). In this regard, "courts have recognized that contracting officers are 'entitled to exercise discretion upon a broad range of issues confronting them' in the procurement process." *Id.* at 1332. In addition, when reviewing an agency's procurement decision, the Court should recognize that the agency's decision is entitled to a "presumption of regularity." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). "The [C]ourt should not substitute its judgment for that of a procuring agency." *Cincom Sys., Inc. v. United States*, 37 Fed. Cl. 663, 672 (1997). And so, "[t]he protestor must show, by a preponderance of the evidence, that the agency's actions were either without a

reasonable basis or in violation of applicable procurement law." *Info. Tech. & Applics. Corp. v. United States*, 51 Fed. Cl. 340, 346 (2001), *aff'd*, 316 F.3d 1312 (Fed. Cir. 2003) (citation omitted).

The Court's standard of review "is highly deferential." *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000). If there is "a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion." *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1301 (D.C. Cir. 1971)). Stated differently, "[the Court] will uphold a decision of less than ideal clarity if the agency's path may be reasonably discerned." *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974). However, if "the agency 'entirely fail[s] to consider an important aspect of the problem [or] offer[s] an explanation for its decision that runs counter to the evidence before the agency,'" then the resulting action lacks a rational basis and, therefore, is defined as "arbitrary and capricious." *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

Unlike RCFC 56 summary judgment motions, "the existence of genuine issues of material fact does not preclude judgment on the administrative record" under RCFC 52.1. *Tech. Sys., Inc. v. United States*, 98 Fed. Cl. 228, 242 (2011); *see also* RCFC 56. Rather, the Court's inquiry is whether, "given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." *A&D Fire Prot., Inc. v. United States*, 72 Fed. Cl. 126, 131 (2006) (citing *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005)).

In its Complaint and Motion for Judgment on the Administrative Record, SigNet propounds two primary explanations why it believes the United States acted improperly: first, Securityhunter's quotation did not include a complete CTA document in violation of the RFQ; and second, the SSA failed to conduct the evaluations fairly and consistently with the RFQ's evaluation scheme. Not unexpectedly, the United States and Securityhunter argue to the contrary and separately move for judgment. The arguments will be addressed in turn.

1. <u>Completeness of Securityhunter's CTA</u>

SigNet contends that the SSA should have disqualified Securityhunter from award because its CTA was incomplete and thus "defective." (Pl. MJAR at 33–34). Specifically, SigNet indicates that Securityhunter's CTA document did not adequately address the following elements in the model CTA: Specific Team Activities, Terms of Arrangement, Team Ordering Procedures, Responsibilities of Team Lead, Responsibilities of Team Members, Pricing, Delivery Responsibility, Liabilities, and Legal Relationship. (*Id.*). As such, SigNet postulates that the SSA violated the express terms of the RFQ when it continued to consider Securityhunter's quotation. (*Id.*). The United States argues that SigNet misapprehends the RFQ and that the RFQ did not require a proposed CTA document to mirror the format of the model document. (Def.'s MJAR at 20). Securityhunter counters that its proposal did in fact satisfy each element of the CTA requirements. (Int.-Def.'s MJAR at 23–32). The Court finds that Securityhunter's quote addressed all elements as required by the RFQ.

As the Federal Circuit has explained, "a proposal that fails to conform to the material terms and conditions of the solicitation should be considered unacceptable and a contract award based on such an unacceptable proposal violates the procurement statutes and regulations." *E.W. Bliss Co. v. United States*, 77 F.3d 445, 448 (Fed. Cir. 1996) (citation omitted); *see also Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) ("To be acceptable, a proposal must represent an offer to provide the exact thing called for in the request for proposals, so that acceptance of the proposal will bind the contractor in accordance with the material terms and conditions of the request for proposals.").

As recited above, the RFQ set forth the requirements when an offeror's quotation proposed a CTA and provided a referential "model" CTA, (AR 496–97; 284–86). The model required that the relevant document (1) "state the various types of activities that will be incorporated into the team arrangement and who is the primary party responsible for the particular activity," (AR 284), (2) "define the whole course of the project," (3) "specify the duration, the players, the responsibilities, and the limitations of the various players," (*id.*), (4) outline and specify the duties of the designated team lead at each phase of the project specify and describe the individual duties of the team member, (*id.*), (5) "state whether the team lead or each team member is responsible for a particular part of the project, so that delivery responsibility is clearly established," (AR 285), and (6) "address each team member's responsibilities and performance requirements so that liability is clearly established[.]" (*Id.*).

Securityhunter's CTA document explained that ETC's sole responsibility as a team member was "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." (AR 824). The Court reiterates this to highlight that ETC's role is quite narrow. In its Response and Motion for Judgment on the Administrative Record, Securityhunter detailed how its quote adequately addressed each element called into question by SigNet. (Int.-Def.'s MJAR at 24–32). The Court addresses those elements below.

First, SigNet asserts that Securityhunter's CTA document did not provide a "'complete' answer" to either the "Specific Team Activities" or the "Delivery Responsibility" elements in the model CTA. (*See* Pl.'s MJAR at 16–17). Paragraph 9 of Securityhunter's CTA document identifies ETC's "primary delivery responsibilities" as being limited to "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." (AR Tab 21 at 824). Thus, Securityhunter notes, (Int.-Def.'s MJAR at 24–25), ETC's role in the CTA was accordingly restricted to this very limited scope. Since the RFQ is only for a BPA, not any particular call order, the SSA did not solicit proposals for any specific projects, thus there were no specific tasks to describe at this early stage of the procurement. The level of detail describing the team activities and delivery responsibilities for the BPA was consistent with both the nature of a BPA and the proposed CTA relationship, where ETC's responsibilities were limited to a specific, narrow scope of work (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮). Thus, SigNet has not proved there are specific team activities or delivery responsibilities omitted from Securityhunter's CTA. Therefore, it has also failed to demonstrate that it was arbitrary or an abuse of discretion for the SSA to accept Securityhunter's CTA document.

Second, SigNet argues that Securityhunter's CTA failed to provide "a 'list [of] the supplies/services and pricing'" per the "Team Ordering Procedures" element. (Pl.'s MJAR at 17–19 (quoting AR Tab 9 at 284) (alteration in MJAR); *see also* Pl.'s MJAR at 19–20). This is

13

refuted by the record. The introductory paragraph preceding Securityhunter's CTA explained that ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████." (AR Tab 21 at 822). Further, contrary to SigNet's position, "Services Required" under the SOW did not require Securityhunter to detail each SOW requirement on a line-by-line basis, particularly where ETC's role as a CTA team member was limited to the provision of "█████████████████████████████." (*See* AR Tab 21 at 825). Securityhunter did not need to identify other SOW services because none of them are relevant or applicable to the CTA. Based on ETC's limited role, SigNet's argument here also fails.

Next, SigNet claims Securityhunter's CTA meets only two of the requirements of the "Terms of Arrangement" element, (1) the duration and the identification of "players," and (2) part of the "responsibilities" requirement, thereby disregarding other responsibilities and limitations. (*See* Pl.'s MJAR at 19). For the reasons discussed above, Securityhunter's CTA adequately addressed the CTA members' responsibilities. The "Terms of Arrangement" element provided that "[t]he terms of the CTA must define the whole course of the project. The CTA must specify the duration, the players, the responsibilities, and the limitations of the various players." (AR Tab 9 at 284). However, the model CTA does not define any of these specifications. (*See id.*). Even so, Securityhunter's CTA contained various limitations applicable to each team member, such as: paragraphs 3 and 17 (defining parameters of liability), paragraph 9 (outlining responsibilities), paragraph 12 (administrative functions and fee), and paragraph 13 (independent contractor relationship and obligations). (*See* AR Tab 21 at 822–27). Given that the subject CTA document defined limitations and each other "Terms of Arrangement" element as required, there is no basis for the Court to conclude that it was arbitrary for the SSA to determine the CTA addressed the "whole course of the project." (*See* AR Tab 9 at 284–87).

SigNet's next arguments allege that Securityhunter's CTA document failed to meet the Responsibilities of Team Lead and Team Member elements. (Pl.'s MJAR at 20). The former element states that "[t]he CTA document must outline and specify the duties of the designated team lead at each phase of the project" and the latter states that "[t]he CTA document must specify and describe the individual duties of the team members." (AR Tab 9 at 284). Again, the Court is satisfied with Securityhunter's explanation of those elements and in accord with the SSA's assessment of this portion of the CTA. Paragraph 9 of the CTA described Securityhunter's and ETC's respective duties as the designated team lead and the team member. (*See* AR Tab 21 at 824). Subparagraphs (a) and (b) outline Securityhunter's role and responsibilities, subparagraph (c) details ETC's role and responsibilities, and subparagraph (d) breaks down the procedures pursuant to which Securityhunter will manage the team's performance of call orders. (*See* AR 824–25). Paragraph 12 solidified that Securityhunter "███████████████████████████████████████████." (AR 825). Paragraph 14 additionally identified Securityhunter's oversight and management of the invoicing and payment processes for the duration of the contract. (*See id.*). Paragraph 15 stated that Securityhunter and ETC are individually responsible for reporting sales and paying the Industrial Funding Fee ("IFF") to GSA. (*See id.*). Paragraph 16 specified that each CTA member is responsible for warranties and repairs related to work that they perform under Paragraph 9. (*See id.*). Paragraph 17 identified each party's respective liability. (AR 826). It is unclear what information SigNet believes to be excluded. Based on the foregoing, SigNet has not provided any basis for the Court to conclude that the SSA's evaluation was arbitrary or an abuse of discretion.

14

SigNet next contends that Securityhunter's CTA document failed to satisfy the specificities of the "Pricing" element. (Pl.'s MJAR at 21, citing AR Tab 9 at 285). Securityhunter's quote, which was incorporated into the CTA by reference in paragraph 17, included a "CTA ITEM LISTING" table that detailed the specified labor, license, and items that ETC would provide. (AR 828). As such, the Court finds the SSA reasonably was within its discretion to accept Securityhunter's quotation because it adequately addressed the pricing element and was therefore properly considered.

SigNet also claims that Securityhunter's CTA failed to comply with the requirements of the "Liabilities" element. (Pl.'s MJAR at 21–22). That element states as follows: "The CTA document must address each team member's responsibilities and performance requirements so that liability is clearly established." (AR Tab 9 at 284). The CTA specifically addressed each team member's liability in paragraphs 4 and 17. (*See* AR Tab 21 at 822, 826). Based on the text of those paragraphs and the rationale regarding the responsibilities and performance requirements provided above, SigNet's challenge on this point is without merit.

In its final argument, SigNet contests Securityhunter's compliance with the "Legal Relationship" element in the model CTA, (Pl.'s MJAR at 22–23), and argues that Securityhunter's CTA document "says nothing about each team member 'operating as a "prime" for the portion of the work they are performing.'" (Pl.'s MJAR at 22 (quoting AR Tab 9 at 286)). Paragraph 21 of Securityhunter's CTA, titled "Legal Relationship," declared that █████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████." (AR Tab 21 at 826). The same paragraph goes on to state that "█████████████████████████████████████████████████████████████████████████████████████." (*Id.*). The model CTA did not include a requirement that the CTA include a provision stating that "all team members must be operating as a 'prime.'" (*See* AR Tab 9 at 286). However, that is apparent based on the content of Securityhunter's CTA document, which identified the FSS contract numbers for both Securityhunter and ETC. Any service or equipment provided by ETC would be ordered through its own FSS contract (*i.e.*, ETC serving as a "prime contractor" for its limited scope of work). Again, SigNet misses the mark in attempting to prove that Securityhunter's compliance with the RFQ was deficient or that the SSA's reliance was arbitrary and capricious.

Reviewing of Securityhunter's total offer, the SSA determined that Securityhunter provided the information required by the RFQ with respect to its CTA document. (AR 2065 (Quotation Checklist, Notes: ¶ 8 – documenting agency determination that CTA document was "complete (addresse[d] each element in the CTA 'model' document)" and fully executed)).The Court agrees that Securityhunter's CTA was complete, and the SSA evaluated the Securityhunter/ETC CTA document as the RFQ instructed. (*See* AR 2065 (Quotation Checklist), AR 2184 (finding that Securityhunter's proposal was complete); AR 2079 (where the TET noted the roles and responsibilities of the CTA team members and stated "█████████████████████████████████████████████████████████████████████████████.")). SigNet's claims that Securityhunter's CTA document was incomplete or that the SSA improperly evaluated that document are contradicted by the administrative record.

15

Because Securityhunter's CTA document complied with the RFQ's requirements, including providing the mandatory information stated in the model CTA document, though SigNet disagrees, the Court finds that the SSA properly considered Securityhunter's proposal. "[M]ere disagreements are not enough" to overcome an agency's evaluation determinations or award decision. *GEO Grp., Inc. v. United States*, 100 Fed. Cl. 223, 228 (2011). Thus, the Court rejects SigNet's claims regarding the deficiencies of Securityhunter's CTA.

   2. Fairness in Evaluations

As its ensuing argument, SigNet contends that the SSA failed to uniformly evaluate Securityhunter's and SigNet's proposals in that Securityhunter was awarded the BPA notwithstanding Securityhunter's termination as an authorized Lenel VAR. (Pl.'s MJAR at 34–35). In this connection, SigNet also argues that Securityhunter/ETC lacked a "substantial number of Lenel-authorized technicians." (*Id.*). SigNet suggests that, based on its lack of Lenel authorization, "it is implausible that Securityhunter could have been evaluated as having earned a higher rating than [SigNet] for Corporate Experience and Technical Approach evaluation factors." (*Id.* at 35). Again, SigNet's claims are unavailing.

In a best value procurement, the Court will not substitute its judgment for that of the agency. *See RISC Mgmt. Joint Venture v. United States*, 69 Fed. Cl. 624, 638 (2006). A contracting officer has "even greater discretion" in making an award on a best value basis as opposed to based on cost alone. *Sys. Plus, Inc. v. United States*, 69 Fed. Cl. 757, 774 (2006). The plaintiff has the burden of showing "that its position in the procurement was prejudiced." *Id*. When addressing an argument that there was a flawed best value determination, "[t]he Court's main task is to ensure that the CO articulated a rational connection between the facts found and the choice made." *Allied Tech. Grp.*, 94 Fed. Cl. at 49. Here, the CO met that burden.

Securityhunter's quotation set forth a technical approach that the agency determined was consistent with the RFQ's evaluation criteria. SigNet has not alleged that the SSA reached its own evaluation in error, but relies solely on the SSA's evaluation of Securityhunter's quote in connection with Lenel. (Pl.'s MJAR at 34–35). As noted, because Securityhunter is not a Lenel VAR, ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ By accepting the CTA as part of Securityhunter's quotation, the SSA therefore established privity of contract with both Securityhunter and ETC. (*See* AR Tab 37 at 2468–67).

The RFQ required offerors to provide Lenel PACS products and services. (AR 524–25). Securityhunter provided a copy of the CTA document in its quotation. (AR 822–28). Therein, Securityhunter stated: "█████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████." (AR 759). In addition, Securityhunter's quotation stated that ETC's role under the CTA would "████████████████████████████████████████████████████████████████████████." (AR 780). Securityhunter stated that its CTA with ETC would ensure that its "███████████████████████████

16

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." (*Id.*) In addition to its intended use of a CTA with ETC, Securityhunter also stated that it would "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" and "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." (AR 780). As part of its proposed subcontracting plan, Securityhunter stated that it "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." (AR 753–54).

Based on its CTA and quotation, the TET determined that "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." (AR 2082–83). The TET further determined:



(AR 2083). As part of this evaluation, the TET further recognized that "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" with ETC, and that ETC would "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." (AR 2079). Additionally, the TET determined that Securityhunter's detailed technical approach had "▮▮▮▮▮▮▮▮▮▮▮▮▮▮" and the TET could not identify any concerns or weaknesses. (AR 2083). Self-evident by its ultimate award, the CO agreed with the TET's evaluation. The recommendation acknowledges and evaluates the CTA specifically. Thus, the SSA's detailed evaluation of Securityhunter's technical approach quote was reasonable and consistent with the RFQ.

SigNet disregards the fact that the RFQ did not refer to the phrase "value added reseller" or "VAR," or establish a requirement that a contractor be certified as a Lenel VAR to be awarded the BPA. In response to one question proffered by an offeror, the SSA specifically stated that the prime was not required to be a Lenel VAR. (*See* AR 520 (Question #55: "Given the complexity of the systems involved, must the Prime be a Lenel VAR?" Answer: "It is preferable that the Prime be a [Lenel] VAR but a team member is acceptable as well.")). Even so, SigNet emphasizes that it would be "impossible" for a contractor to perform under the BPA without a substantial number of Lenel-authorized technicians. (Pl.'s MJAR at 8–11). As the United States points out this RFQ is not a contract for continual, full-time, constant maintenance of all SSA locations, but instead, a BPA pursuant to which work be performed by the contractor when call orders are issued for services at specific locations. (AR 458–59). Securityhunter may hire or subcontract individuals with Lenel VAR certifications after award. Therefore, it is

17

irrelevant that Securityhunter is not certified as a Lenel VAR because the RFQ did not require the prime contractor to be certified as Lenel VAR.

Finally in its Lenel-related sally, SigNet argues that "[s]ince the access control systems with Lenel as the main component represent approximately 30% of the overall SOW requirements, and since ETC had ███████████████████████████, it strains credulity to believe that the Securityhunter CTA could service 1,500 facilities nationwide, plus U.S. overseas territories, in accordance with the requirements of the SOW." (Pl.'s MJAR at 34–35). Simply put, this is not supported in the record. Even assuming that it were, SigNet fails to consider that ETC (as the CTA team member) is not barred from hiring more Lenel-certified employees as needed based on call orders issued under the BPA, and neither Securityhunter nor ETC are prohibited from subcontracting work relating to the access control systems to subcontractors who are certified Lenel technicians. Thus, the number of Lenel-certified employees is irrelevant, and consideration of these facts would be speculative.

Within this argument, SigNet summarily states in a single-sentence paragraph that, "[the SSA's] evaluation of Securityhunter's price leads ineluctably to the inference that the price analysis was skewed in Securityhunter's favor, to [SigNet's] prejudice. (Pl.'s MJAR at 35) Without offering some scintilla of support, it is unclear what SigNet wants the Court to do with that argument. "Such naked claims, no matter how vigorous, fall far short of meeting the heavy burden of demonstrating that the findings in question were the product of an irrational process and hence were arbitrary and capricious." *Banknote Corp. of America, Inc. v. United States*, 56 Fed. Cl. 377, 384 (2003), *aff'd*, 365 F.3d 1345 (Fed. Cir. 2004). Nonetheless, the Court reiterates that the record demonstrates the SSA conducted the appropriate price analysis and reasonably concluded that Securityhunter's price was reasonable. (AR 2184–219).

While Lenel authorization is not required by the RFQ, Securityhunter has an effective CTA with a Lenel authorized retailer, thereby negating SigNet's apparent concerns. SigNet has failed to persuade the Court that prejudice existed in the analysis of SigNet and Securityhunter's proposals. Based on the analysis above, the record demonstrates that the SSA conducted the appropriate price analysis and rationally concluded that Securityhunter's proposal was complete. (AR 2184–219). As such, SigNet cannot prove that the SSA's award was irrational, arbitrary and capricious, or contrary to applicable law and regulation. Thus, the Court must enter judgment for the United States and Securityhunter.

"Because proving success on the merits is a necessary element for a permanent injunction." *Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 999 (Fed. Cir. 2018). Since SigNet failed to establish success on the merits for the reasons set forth above, injunctive relief would be likewise be inappropriate.

### III.     Conclusion

For the reasons set forth above, the Court hereby **DENIES** SigNet's Motion for Judgment on the Administrative Record, (Pl.'s MJAR, ECF No. 25), **GRANTS** the United States' Motion for Judgment on the Administrative Record, (Def.'s MJAR, ECF No. 28), **GRANTS** Securityhunter's Motion for Judgment on the Administrative Record, (Int.-Def.'s MJAR, ECF No. 29), and **DENIES** Securityhunter's Motion to Dismiss and Motion to Strike, (*id.*).

The Clerk is directed to enter judgment in accord with this Opinion. Each side shall bear its own costs. The parties shall file proposed redactions to this Opinion on or before July 1, 2021.

**IT IS SO ORDERED.**



s/    David A. Tapp
DAVID A. TAPP, Judge